K. Samura Shoten, Ltd. v. United States

No. 4437.—Invoice dated Kobe, Japan, July 1, 1937.
      Entered at Honolulu, T. H., July 12, 1937.
      Entry No. 152.

(Decided November 1, 1938)

*Lawrence & Tuttle* (*Frank L. Lawrence* and *George R. Tuttle* of counsel) for the plaintiff.
      *Webster J. Oliver*, Assistant Attorney General (*John J. McDermott* and *Richard F. Weeks*, special attorneys), for the defendant.

Evans, Judge: This is an appeal from the action of the United States appraiser of merchandise at the port of Honolulu in finding a value upon certain importations of Japanese footwear entered at that port and described on the invoice as " 'Hinchikari' 10 Doz. Cotton Socks with Rubber Soles, 'Jikatabi'." They were invoiced at yen 7.60 per dozen (pairs), packed, were entered under a certificate pending reappraisement at $1.046178, and were appraised as entered. Jikatabi is a name applied to a type of footwear worn outdoors as distinguished from the type worn indoors. A sample of the merchandise involved was introduced in evidence and marked Collective Exhibit 1. It may briefly be described as an article of footwear composed of a cotton top attached to a rubber sole, which in the molding thereof has been divided so as to separate the great toe from the other toes of the foot. The sole is corrugated and the shoe has a very flat heel. The upper is made of light weight cotton drill having a front seam from the top of the upper to the dividing line of the sole which separates the great toe from the other toes of the foot. This upper is fastened to a vamp made of the same material, the fore part of which vamp is covered by a moulded rubber tip. The upper fastens in the rear by means of three flat hooks intended to be caught behind with loops made of cotton cord.

The tabi has a blue cotton lining of light weight and an insole of white cotton. It has no counter. The imported merchandise (Exhibit 1) will hereinafter be designated as tabis. The appraiser stated that pursuant to the provisions of T. D. 46158, which sets forth the Presidential proclamation of February 1, 1933, changing the basis for the assessment of duty on certain types of footwear, he appraised on the basis of the American selling price (section 402 (g), act of 1930) as

stated above, at $1.046178 per pair. For convenience of reference we set forth the proclamation in question as follows:

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA

A PROCLAMATION

Whereas under and by virtue of section 336 of Title III, Part II, of the act of Congress approved June 17, 1930 (46 Stat. 590, 701), entitled "An Act to provide revenue, to regulate commerce with foreign countries, to encourage the industries of the United States, to protect American labor, and for other purposes," the United States Tariff Commission has investigated the differences in costs of production of, and all other facts and conditions enumerated in said section with respect to, boots, shoes, or other footwear (including athletic or sporting boots and shoes), the uppers of which are composed wholly or in chief value of wool, cotton, ramie, animal hair, fiber, rayon, or other synthetic textile, silk, or substitutes for any of the foregoing, with soles composed wholly or in chief value of india rubber or substitutes for rubber, and boots and shoes or other footwear, wholly or in chief value of india rubber, not specially provided for, being wholly or in part the growth or product of the United States, and of and with respect to like or similar articles wholly or in part the growth or product of the principal competing countries;

Whereas in the course of said investigation a hearing was held, of which reasonable public notice was given and at which parties interested were given reasonable opportunity to be present, to produce evidence, and to be heard;

Whereas the commission has reported to the President the results of said investigation and its findings with respect to such differences in costs of production;

Whereas the commission has found it shown by said investigation that the principal competing countries for boots, shoes, or other footwear (including athletic or sporting boots and shoes), the uppers of which are composed wholly or in chief value of wool, cotton, ramie, animal hair, fiber, rayon, or other synthetic textile, silk, or substitutes for any of the foregoing, with soles composed wholly or in chief value of india rubber or substitutes for rubber, provided for in paragraph 1530 (e) of Title I of said tariff act, are Czechoslovakia and Japan, and that the principal competing country for boots, shoes, or other footwear, wholly or in chief value of india rubber, provided for in paragraph 1537 (b) of Title I of said act, is Czechoslovakia, and that the duties expressly fixed by statute do not equalize the differences in the costs of production of the domestic articles and the like or similar foreign articles when produced in said principal competing countries; and that said differences can not be equalized by proceeding under the provisions of subdivision (a) of said section and act;

Whereas the commission has specified in its report the ad valorem rates of duty based upon the American selling price, as defined in section 402 (g) of said act, of the domestic articles found by the commission to be shown by said investigation to be necessary to equalize such differences; and

Whereas in the judgment of the President such ad valorem rates of duty based upon said American selling price are shown by such investigation of the Tariff Commission to be necessary to equalize such differences in costs of production:

Now, therefore, I, Herbert Hoover, President of the United States of America, do hereby approve said report and proclaim that the rate of duty shown by said investigation to be necessary to equalize such differences, within the limit provided in said section 336, on boots, shoes, or other footwear (including athletic or sporting boots and shoes), the uppers of which are composed wholly or in

chief value of wool, cotton, ramie, animal hair, fiber, rayon or other synthetic textile, silk, or substitutes for any of the foregoing, with soles composed wholly or in chief value of india rubber or substitutes for rubber, is 35 per centum ad valorem based upon the American selling price as defined in section 402 (g) of said act of boots, shoes, or other footwear (including athletic or sporting boots and shoes), the uppers of which are composed wholly or in chief value of wool, cotton, ramie, animal hair, fiber, rayon or other synthetic textile, silk, or substitutes for any of the foregoing, with soles composed wholly or in chief value of india rubber or substitutes for rubber, manufactured or produced in the United States; and that the rate of duty shown by said investigation to be necessary to equalize such differences, within the limit provided in said section 336, on boots, shoes, or other footwear, wholly or in chief value of india rubber, not specially provided for, is 25 per centum ad valorem based upon the American selling price of boots, shoes, or other footwear, wholly or in chief value of india rubber, not specially provided for, manufactured or produced in the United States.

In witness whereof I have hereunto set my hand and caused the seal of the United States to be affixed.

Done at the city of Washington this 1st day of February, in the year of our Lord nineteen hundred and thirty-three, and of the Independence of the United States of America the one hundred and fifty-seventh.

[SEAL]                                           HERBERT HOOVER.

By the President:
    HENRY L. STIMSON,
            Secretary of State.

It appears fairly clear from the evidence that the American selling price adopted was the price of a shoe manufactured by the U. S. Rubber Co. which bears the trade mark "Keds" and is known in the trade as Universal. This Ked is the usual type of canvas top, corrugated rubber sole and rubber heel high shoe laced to the vamp with a reenforced insole of shock absorbing rubber fabric. The upper bears five eyelets and four hooks on each side of the front opening. The shoe has a canvas tongue attached at each side of the front opening and of sufficient width to admit the foot. It also has a counter of some stiff material. The shoe is also capped with a rubber tip.

The price of these Keds was the price at San Francisco. The testimony discloses that San Francisco was the principal wholesale market for this type of shoe. A sample of the Keds similar to the one which formed the basis for taking the American selling price was introduced in evidence and marked Illustrative Exhibit A. There was also received in evidence, purely for the purpose of illustrating the testimony, Collective Exhibit B, cotton tabis which, according to the testimony, are the type worn by Japanese indoors. The testimony also establishes that the tabis such as are involved herein are worn without socks, principally by Japanese plantation laborers and fishermen.

The appraiser at the port of Honolulu stated on cross-examination:

In appraising, we do not consider the value of the upper. It is just the fact it is a cotton top shoe. We don't care about the value of the cotton uppers and the sole. That doesn't enter into the appraisement. The fact that it is cotton top, rubber soled shoe is what we based the appraisement on.

Undoubtedly the appraiser's position was based upon the provision of the Presidential proclamation, *supra*. In proclaiming a new rate of duty the President apparently endeavored to follow as closely as possible the general terms used in paragraph 1530 (e) of the Tariff Act of 1930 providing for the assessment of duty, which, insofar as applicable, is as follows:

PAR. 1530. (e) * * * boots, shoes, or other footwear (including athletic or sporting boots and shoes), the uppers of which are composed wholly or in chief value of wool, cotton, ramie, animal hair, fiber, rayon or other synthetic textile, silk, or substitutes for any of the foregoing, whether or not the soles are composed of leather, wood, or other materials * * *.

The proclamation makes the rate apply to the merchandise therein described having "soles composed wholly or in chief value of india rubber or substitutes for rubber." Such shoes as are to be taxed by virtue of the proclamation come under the particular type of shoes described "with soles made of other material."

While it is true that the Presidential proclamation, *supra*, furnishes the basis for the taxing rate to be applied on shoes with uppers of cotton, etc., and soles of rubber or substitutes therefor, a proclamation of this character must necessarily be stated in comprehensive general terms. It derives its force and effect from the provision of the tariff act. When we look at the tariff act the court finds that the taxing provision thereof relating to rates made by Presidential proclamation are applied through provisions of the act, which in the court's judgment clearly indicate that other elements enter into the appraisement and assessment of this duty and that it is not solely a question of whether the uppers are of cotton and the soles are of rubber.

The genesis of the Presidentially proclaimed rates applied to merchandise herein is section 336 of the Tariff Act of 1930, which reads in part:

SEC. 336. (a) CHANGE OF CLASSIFICATION OR DUTIES.—In order to put into force and effect the policy of Congress by this Act intended, the commission * * * shall investigate the differences in the costs of production of any domestic article and of any like or similar foreign article. * * *

The purpose of the tariff act is declared in the title thereto, which states that it is—

An act to provide revenue, to regulate commerce with foreign countries, *to encourage the industries of the United States, to protect American labor,* and for other purposes. [Italics ours.]

Section 336 further provides:

\* \* \* \* \* \* \*

If the commission finds it shown by the investigation that the duties expressly fixed by statute do not equalize the differences in the costs of production of the domestic article and the like or similar foreign article when produced in the principal competing country, the commission shall specify in its report such increases or decreases in rates of duty expressly fixed by statute (including any necessary change in classification) as it finds shown by the investigation to be necessary to equalize such differences.

And further, in subsection (e) (2), under the subtitle "Ascertainment of Differences in Costs of Production," that the Commission shall take into consideration—

(C) Other relevant factors that constitute an advantage or disadvantage in competition, \* \* \*.

In the case of *Japan Import Co.* v. *United States*, Reap. Dec. 3825 (affirmed in 24 C. C. P. A. 167, T. D. 48642), the court had occasion to discuss the provisions of section 336, *supra*, in connection with section 402 (g) of the same act, and there called attention (in the decision below) to the fact that Congress in enacting said section 336 (a) used the terms "like or similar" foreign articles, whereas in section 402, *supra*, the terms "such or similar" merchandise are used. We there considered the legislative history of said section 336, with a view to determining whether Congress in changing the language of section 315 of the Tariff Act of 1922 and the language of subsection 4 of section 402, eliminated all reference to competitive articles. It was stated:

We cannot agree that Congress eliminated all reference to competitive articles, for we find in the section itself, (e) (2) (C), quoted above, that in arriving at the cost of a foreign article the commission shall take into consideration, among other things, "other relevant factors that constitute an advantage or disadvantage in *competition.*"

In our view Congress intended to broaden the scope of comparability of foreign and domestic merchandise by the use of the word "like" rather than "such" which is used in other parts of the statute. The term "such," as stated by appellant, contemplates identity, whereas "like" indicates resemblance.

After quoting from dictionary definitions of the word "like" the court said further:

Therefore the investigation authorized by said section 336 is directed to the "differences in the costs of production of any domestic article and of any" foreign article which resembles or is similar to the domestic article.

And further:

\* \* \* How could American labor be protected except by prohibiting such competition as would tend to reduce substantially the sale of similar products of American labor? In other words, the object of this act is to tax foreign products that compete with products produced by American labor. There would be no purpose in investigating like and similar foreign articles nor in attaching a high

amount of duty thereon unless such like or similar foreign articles were competing in the American markets against the home product.

When, therefore, the Presidential proclamation under authority of said section 336 provides for the assessment of 25 per centum ad valorem based upon the American selling price of the boots and shoes described therein it follows as a matter of course that such boots and shoes or other footwear as are to be taxed must be the kind of articles comprehended in said section 336, to wit, any domestic article like or similar to the foreign article wherein the costs of domestic production are not equalized by the statutory duties thereto applicable.

The court is not in accord with the views expressed in the recent decision on paper and cotton upper, rubber-soled footwear, *Japan Import Co.* v. *United States*, Reap. Dec. 4389, wherein it was said:

In other words, section 402 (g) provides for appraisement of the imported article on the American selling price of "such" or identical articles to the imported as are sold in the United States.

Said section 402 (g) is in the following language:

(g) AMERICAN SELLING PRICE.—The American selling price of any article manufactured or produced in the United States shall be the price, including the cost of all containers and coverings of whatever nature and all other costs, charges, and expenses incident to placing the merchandise in condition packed ready for delivery, at which such article is freely offered for sale to all purchasers in the principal market of the United States, in the ordinary course of trade and in the usual wholesale quantities in such market, or the price that the manufacturer, producer, or owner would have received or was willing to receive for such merchandise when sold in the ordinary course of trade and in the usual wholesale quantities, at the time of exportation of the imported article.

The interpretation of this language as set forth in the above decision is, in the court's opinion, not only out of harmony with the theory but is completely out of consonance with the statute itself. The term "such" used in said section 402 (g) relates back to the words "any article produced or manufactured in the United States," not to an imported article that is sold in competition in the United States. Under the interpretation placed upon that section in said Reap. Dec. 4389 there could be no American selling price for a commodity upon its first importation. Nor would it accomplish the ends desired in the instant case. From the record "like" merchandise had been imported heretofore and appraised at the foreign-market value. If now it is to be appraised upon the American selling price of "identical" merchandise only, it would not accomplish the desired end because the amount of duty levied under the theory of section 336, *supra*, was not sufficient to equalize the differences in cost of the domestic article, if there were a competing article in the foreign country. The

court's opinion in said Reap. Dec. 4389 is not in harmony with the decision in the case of *Japan Import Co.* v. *United States*, 24 C. C. P. A. 167, T. D. 48642, and decisions therein cited.

I therefore unhesitatingly conclude that the appraising officers were acting in accordance with the statute when they selected a domestically produced rubber-soled, fabric top shoe the American sales price of which was used as the basis for appraisement. However, the following condition must also attach to such selection, to wit, it must be a domestic article with which a like or similar foreign article has an advantage in competition, which advantage is not equalized by the amount of duty assessed on the imported article under the tariff act. In other words, that the American selling price shall be a selling price of a domestic article like or similar, within the meaning of the tariff act, to the foreign article in question. Believing this to be the correct theory of the law, the court will proceed to an examination of the evidence in this case for the purpose of determining whether or not Collective Exhibit 1, the tabi, is like or similar to Illustrative Exhibit A, which latter exhibit, according to the preponderance of the evidence in this case, is the domestic article which furnished the basis for the appraisement.

The evidence discloses and an inspection of the samples in evidence supports the testimony, that Collective Exhibit 1 is a very inferior shoe to Illustrative Exhibit A. The cloth materials in Exhibit 1, as we have pointed out above, are different and of a rather poor finish. The same is true to a greater extent of the lining and insole, while the cloth on Illustrative Exhibit A appears to be of a fair grade of canvas. The rubber in Collective Exhibit 1, according to the testimony and judged by comparison, is lighter and of a less quantity than that in Exhibit A. Exhibit 1 is much more flexible than Exhibit A, an element which, according to the testimony, appeals to the Japanese field workers who are large purchasers of merchandise like Exhibit 1. The bifurcated toe of Exhibit 1 appeals to the Japanese purchasers because in Japan they have the habit of wearing wooden soled shoes which have a string that passes between the great toe and the other toes which holds them on the foot, and further, by the fact that while indoors they wear a bifurcated cloth tabi shoe. The appearance, therefore, of Exhibit 1 is such as, according to the testimony and from an inspection, does prevent it from having sales appeal in the American market. In other words, it is a style which would not be adopted by American wearers of rubber-soled, cotton top shoes. This is so marked a distinction that the Government appraiser, Mr. Bemrose, stated:

Why, there is no comparison. If you were to walk down Fort street with a pair of these on (Exhibit 1) you would get a crowd following you.

He further stated that he did not really think when the matter was first brought to the appraiser's office that this particular shoe would enter into competition with an American made shoe. This difference in appearance so impressed the Japanese witness Nakano that he stated that there was no competition between the tabi and the American shoes; that the American shoes (Keds) are worn by a different class of people and that he had not seen them used in the fields.

The witness Faria, salesman for a wholesale house in Honolulu who had sold large quantities of Keds throughout the Islands of Hawaii, stated that the tabi didn't interfere with his line at all. This witness also stated that the tabis are not in competition with Keds. Other Japanese witnesses testified to the same effect.

The witnesses Schaegelen, Wilson, and Cadwell, buyers for department stores in San Francisco, all of whom were retailers with long experience in buying at wholesale, testified that there is no similarity between the tabi and other shoes, that an average American would not wear tabis, and that they had never been offered shoes similar to the tabi or seen shoes similar thereto. Since the appraiser concluded that San Francisco was the principal market for the sales of the domestic article with which it is claimed the imported article competes, the testimony of these experienced salesmen who handled the American product should be of some weight as to whether or not the instant merchandise is competitive.

A comparison of the price of the tabi, as shown by the invoice and from the testimony, with the price of the Ked, discloses such a disparity that they cannot be said to be comparable in that respect. The disparity in price between these two types of shoes, as computed in the plaintiff's brief, runs approximately from 25 per centum to 81 per centum. These computations were based upon the evidence.

The Court of Customs and Patent Appeals in the case of *Japan Import Co.* v. *United States*, 24 C. C. P. A. 167, T. D. 48642, stated:

Under the proclamation of the President and said section 336 (a) and (b), the appraisement of the imported goods was to be made at the American selling price of the domestic article like or similar to imported foreign articles, as defined by said section 402 (g).

That case discussed the meaning of the terms "like" and "similar" and cited numerous decisions in support of its conclusion. I do not deem it necessary or advisable to further lengthen this opinion by quotations from such decision. Suffice it to say that measured by the tests of "likeness" and "similarity" as discussed therein the tabis involved in the instant case are not "like" or "similar to" the domestically made shoe, Illustrative Exhibit A.

The court believes this statement is further supported by an examination of the report to the President on rubber-soled and rubber

footwear, the same being Report No. 63, Second Series, upon which the President issued his proclamation increasing the duty on rubber-soled and rubber footwear (T. D. 46158). The court fails to find that the commission made any examination of the cost of production of tabis in Japan. Indeed, it would appear from the testimony that no costs were available at the source to which the Commission looked for its data. Under the last paragraph on page 15 of said report we find this statement:

Invoice prices paid by importers for tennis oxfords and sandals, having canvas upper and rubber soles, entered at the port of New York during the nine months ending September 30, 1932, coming from Japan, the principal source; * * * * were obtained as evidence of foreign costs of production. * * *

In this case the principal market was considered to be San Francisco. Evidence given by the examiner at San Francisco shows that he had not passed upon a single importation of tabi shoes for eight years, which indicates that there had been no importations there during that period of time. Therefore, there could have been no cost data available. The costs such as were taken by the commission were costs for tennis oxfords and sandals having canvas uppers and rubber soles. The commission, therefore, did not have the tabi shoe in mind when it made its findings, and since the President's proclamation must refer, as we believe, to the type of shoe contemplated by the investigation, it was never intended to extend to the tabis in litigation.

The court considers that it has a right to examine the report in question because it is a public document. Furthermore, because of the fact that the language on which the Government appears to rely in the President's proclamation must be construed by the court, the report would furnish a proper ground for determining the character of the merchandise passed upon by the commission and the type of merchandise the rate of which was intended to be increased by the Presidential proclamation.

The court concludes that the appraiser adopted the wrong basis of appraisement and therefore did not correctly state or use the lawful dutiable value for the imported merchandise.

The appraiser testified and his report under the Antidumping statute notes that the foreign-market value on the date of purchase was as invoiced and that the exporter's sales price on said date was the same. It further appears from this report and the appraiser's testimony that the foreign-market value on the date of exportation was as invoiced. The invoice value for these tabis is stated to be yen 7.60 per dozen, which price includes casing. I therefore find that to be the foreign-market value and the dutiable value of the merchandise in suit. According to the evidence the sales at wholesale are usually

in quantities of 10 dozen pairs. In the instant case the invoice covers an importation of 10 dozen pairs of shoes. In the absence of evidence to refute this I find that to be the usual wholesale quantity. Judgment will be rendered accordingly. It is so ordered.