## UNITED STATES v. JAPAN IMPORT Co., INC.

**No. 4568.**—Invoices dated Kobe, Japan, April 17, June 11, May 16, 1934.
Certified April 19, June 12, May 18, 1934.
Entered at New York May 19, July 16, June 19, 1934.
Entry Nos. 826361, 704079, 836414.

### Second Division, Appellate Term

(Decided May 8, 1939)

*Webster J. Oliver*, Assistant Attorney General (*Richard F. Weeks* and *Daniel I. Auster*, special attorneys), for the appellant.
*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) for the appellee.

Before TILSON, KINCHELOE, and DALLINGER, Judges

DALLINGER, Judge: This is an application for a review of the decision and judgment of Sullivan, Judge, rendered September 19, 1938, and reported as Reap. Dec. 4389.

The involved merchandise consists of rubber-soled shoes imported from Japan during the months of May, June, and July, 1934. Entry was made on the basis of the export value, which was advanced by the appraiser over 100 per centum. That official based his appraisement on the American selling price, as defined in section 402 (g) of the Tariff Act of 1930, and his action was predicated on a Presidential proclamation dated February 1, 1933, promulgated as T. D. 46158, 63 Treas. Dec. 232, and issued under authority of section 336 of said tariff act. The pertinent portions of said proclamation read:

Whereas * * * the United States Tariff Commission has investigated the differences in costs of production of * * * boots, shoes, or other foot-wear * * * the uppers of which are composed wholly or in chief value of wool, cotton, ramie, animal hair, fiber, rayon, or other synthetic textile, silk, or substitutes for any of the foregoing, with soles composed wholly or in chief value of india rubber or substitutes for rubber, * * * being wholly or in part the growth or product of the United States, and of and with respect to like or similar articles wholly or in part the growth or product of the principal competing countries;

* * * * * * *

Whereas the commission has found it shown by said investigation * * * that the duties expressly fixed by statute do not equalize the differences in the costs of production of the domestic articles and the like or similar foreign articles when produced in said principal competing countries * * *

Whereas the commission has specified in its report the ad valorem rates of duty based upon the American selling price, as defined in section 402 (g) of said act, of the domestic articles found by the commission to be shown by said investigation to be necessary to equalize such differences; and

Whereas in the judgment of the President such ad valorem rates of duty based upon said American selling price are shown by such investigation of the Tariff Commission to be necessary to equalize such differences in costs of production:

Now, therefore, I, Herbert Hoover, President of the United States of America, do hereby approve said report and proclaim that the rate of duty shown by said investigation to be necessary to equalize such differences, within the limit pro-vided in said section 336, on boots, shoes, or other footwear (including athletic or sporting boots and shoes), the uppers of which are composed wholly or in chief value of wool, cotton, ramie, animal hair, fiber, rayon or other synthetic textile, silk, or substitutes for any of the foregoing, with soles composed wholly or in chief value of india rubber or substitutes for rubber, is 35 per centum ad valorem based upon the American selling price as defined in section 402 (g) of said act of boots, shoes, or other footwear (including athletic or sporting boots and shoes), the uppers of which are composed wholly or in chief value of wool, cotton, ramie, animal hair, fiber, rayon or other synthetic textile, silk, or substitutes for any of the foregoing, with soles composed wholly or in chief value of india rubber or substitutes for rubber, manufactured or produced in the United States; and that the rate of duty shown by said investigation to be necessary to equalize such differences, within the limit provided in said section 336, on boots, shoes, or other footwear, wholly or in chief value of india rubber, not specially provided for, is 25 per centum ad valorem based upon the American selling price of boots, shoes, or other footwear, wholly or in chief value of india rubber, not specially provided for, manufactured or produced in the United States.

At the hearing held before the trial judge at New York on March 24, 1938, it was stipulated and agreed by and between counsel for the respective parties that if the court should find that the imported shoes, samples of which were admitted in evidence as Collective Ex-hibits 1, 2, 3, and 4, were like or similar to the domestic shoes admitted in evidence as Collective Exhibits 1A, 2A, 3A, and 4A, which latter were used by the appraiser as the basis for his appraisement, then the appraised values should be held to be the proper dutiable values. But if, on the other hand, the court should find that the imported shoes were not like or similar to said domestic shoes, then the entered and export values should be deemed to be the proper dutiable values.

In his decision the trial judge has aptly set forth the material testimony introduced both by the plaintiff and the Government at the trial before him.

At the hearing before the trial judge the plaintiff offered in evidence the testimony of two witnesses and the Government that of three witnesses.

The first witness for the plaintiff, William Gold, for twenty-six years a United States examiner of merchandise at the port of New York, described the merchandise at bar as "rubber-soled oxfords, with uppers, two-piece uppers, consisting of a veneer of paper and a lining of cotton." He testified that before making his advisory classification he endeavored to ascertain whether there was a domestic article like or similar to the merchandise at bar, but that he did not find any such domestic articles. Later, upon examining certain domestic shoes represented by Collective Exhibits 1A, 2A, 3A, and 4A, he changed his mind and reached the conclusion that said domestic shoes were like or similar to the imported shoes "under the broad meaning of section 336."

Asked by the court to state the basis of his later decision, he testified as follows:

Both articles are known as rubber-soled oxfords, both the imported and domestic article. The imported article consists of a two-piece upper of "Toyo" paper cloth.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

"Toyo" paper cloth is the trade name.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

It has paper, &ast; &ast; &ast; part of the veneer has the paper.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

That is the outside. That part weighs approximately six ounces to the square yard. &ast; &ast; &ast; and the drill lining weighing approximately three ounces to the square yard.

Judge SULLIVAN. What material is that?

The WITNESS. Heavy coarse cotton with a full yard width, weighing approximately three ounces, three and one-half ounces to the square yard. It has a rubber calendered sole. It has a fancy foxing attaching by that, the rubber sole to the upper.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

I am speaking of Exhibit 1. The purpose of the foxing is to attach the sole or reinforcement sole to the upper for ornamental purposes. It has five eyelets, and has an eyelet stay to reinforce the eyelets.

Mr. AUSTER:

Q. Inside the shoe?—A. Inside the shoe. It has a cotton tongue; it has a cotton counter and it has a cotton binding; it has an inside rubber tip, inside the upper of the shoe.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

—A. Now we have the domestic article. &ast; &ast; &ast; Exhibit 1–A, also known as a rubber-soled oxford, comprised of a two piece upper quarter and vamp. &ast; &ast; &ast; It has a two-piece upper quarter and vamp, weighing approximately six to six and one-half ounces to the square yard.

Judge SULLIVAN. It is a little heavier than Exhibit 1.

The WITNESS. Slightly heavier. It has a drill lining of this heavy coarse cotton, with a full yarn weighing approximately three ounces to the square yard. It is single and double stitched throughout, identical with the imported shoe. It has a single foxing, attaching the upper to the sole, used for reinforcement, and ornamental purpose. It has a cotton binding; it has a composition inner sole, and it has a cotton counter stitched to the shoe, and it has a rubber tip on the outside of the shoe.

Judge SULLIVAN. Does it have any paper in it?

The WITNESS. No paper in this particular shoe. Checking other parts they are equal as far as gauge is concerned, as far as characteristics are concerned, as far as adaptability are concerned. They are sold in the same shops; made by the same process of manufacture. * * *

The only difference in the two shoes is in that slight difference in structure of the upper material of Toyo——

Mr. AUSTER. Outer upper.

The WITNESS. Outer upper. * * * That is the only difference, taking the other parts, part for part, the two shoes are equal.

Q. Is there any difference in the inner tip?—A. Only slight * * *.

Q. Or outer tip?—A. There is a rubber tip on the front part of the vamp on the domestic shoe. There is a rubber tip on the inside of the imported shoe * * *.

Commenting upon this witness' testimony, the trial judge in his opinion said:

I have Exhibits 1 and 1–A before me. The points of similarity are that they are both white rubber-soled shoes. The domestic article appears to be better than the imported. The former has a rubber tip over the toe; the latter has not. The white upper of Exhibit 1–A, the domestic article, is clearly white canvas on the outside lined with an unbleached cotton material. The outside of the white upper of the imported article, Exhibit 1, is widely different in appearance. It has the color of unbleached cotton cloth, or an ecru color. It resembles cotton cloth in appearance, but the testimony is, it is "Toyo" *paper* cloth. The lining or the inside of the upper of the imported shoe is cotton cloth similar to that in Exhibit 1–A the domestic article.

To the eye the two shoes are very far from being identical in appearance, manufacture, and the material of the uppers. There is a similarity between the two shoes. However, you would not mistake one shoe for the other.

The testimony indicates that Examiner Gold first came to the conclusion that the domestic shoe, represented by Exhibit 1–A, was not like or similar to the imported merchandise, Exhibit 1, and that he subsequently changed his mind, and concluded that the domestic shoe was like or similar to the imported shoe.

From this statement of the learned judge it is evident that he considered the imported shoe to be similar to the domestic shoe only in appearance, which is far from being similar as required in the tariff sense of the term.

The second plaintiff's witness, Carl Heymann, a buyer and salesman in the plaintiff corporation, testified that he had never seen any domestic shoes similar to the imported shoes represented by Exhibits 1 to 4 herein, and that in his opinion there were no similar domestic shoes; that the domestic shoe has a canvas upper which can be

cleaned by washing and also a reinforcement at the toe, neither of which characteristics is present in the imported shoe; that any attempt to clean the upper of the imported shoe with water would result in tearing the latter away from the sole; that when he sold the imported shoes 90 per centum thereof were returned to him for the reason that the upper could not be washed or vulcanized as was possible with the canvas uppers of the domestic shoes; and that as a result of this experience he discontinued trying to sell the imported shoes.

On cross-examination the witness testified that while the imported shoe had a tip on the inside at the toe, the only purpose thereof was to prevent the glue in the shoe from adhering to the stocking of the wearer, whereas the tip on the outside at the toe of the domestic shoe was for the purpose of reinforcement and protection of the shoe.

The first defendant's witness, Robert L. Rice, a salesman in the employ of the Hood Rubber Co. of Watertown, Mass., manufacturers of rubber-soled canvas footwear, testified that in his opinion the imported and domestic shoes were very much alike to the eye; that the composition of the outside upper seems to be the only difference; that the object of the "toe tip," whether inside or outside, was to prevent the big toe from coming through; that the imported and domestic shoes were made for the same market and were used interchangeably by the consumer; that the sales of his company decreased by reason of the competition of the imported shoes; that Butler Brothers, who purchased some of the imported shoes instead of those manufactured by his company, got "cold feet."

On cross-examination he testified that the reason Butler Brothers got "cold feet" was that they were not satisfied with the quality of the imported shoes; that the latter sold at a lower price than the shoes of his company; that in his opinion the domestic shoe was better than the imported shoe; and that the domestic shoe had better workmanship expended thereon. On this point the following testimony of this witness is illuminating:

By Mr. SCHWARTZ:

*     *     *     *     *     *     *

X Q. Aside from that point Mr. Rice, look at those two shoes carefully and tell me if there is any one point in which there is a striking inferiority to one as compared to the other?—A. I would not say so.

X Q. Have you looked at the uppers?—A. Yes, I was very frank with you. I thought it was a damn good looking weave.

X Q. We are not talking about appearance now, Mr. Rice. Do you think that a shoe with a paper upper is as good as a shoe with a canvas upper?—A. I did not know it was paper at that time.

X Q. You know it now.—A. I would not say a paper upper was as good. I didn't know they were, not at the time they were in competition.

The second defendant's witness, George A. Bissel, assistant sales manager of United States Rubber Products, testified that he had made

a thorough examination of Collective Exhibit 1 and Collective Exhibit 1–A, and that in his opinion the domestic shoes were similar to the imported shoes; that the only difference was in the composition of the outside uppers; and that not being a technical man he could not say that the outside upper of the imported shoe was made of paper.

On cross-examination he testified that the upper was a material part of a shoe. He then testified as follows:

By Mr. SCHWARTZ:

Q. Assuming that the upper in the Collective Exhibit 1, is made of paper, would you say that Collective Exhibit 1–A is a better or poorer shoe than Collective Exhibit 1?—A. I am not in a position to answer that, because I have no knowledge of the wearability, never wore them, never seen them worn.

Mr. AUSTER. You mean Exhibit 1?

The WITNESS. Exhibit 1, the imported shoe.

By Mr. SCHWARTZ:

Q. Upon what did you base your opinion that they were similar?—A. As far as appearance.

The third and last of the defendant's witnesses, Ralph F. Little, sales manager of the Hood Rubber Co., testified that he had come in contact with the imported shoes represented by Collective Exhibit 1 in the New York market during the year 1934. On being shown Exhibit 4, one of the imported shoes, and Exhibit 4–A, one of the domestic shoes known as the Firestone shoe, and asked to compare them, the witness stated that the only differences consisted in the composition of the uppers and the fact that the domestic shoe had an outside toe cap whereas the imported shoe had an inside toe cap.

On cross-examination he testified as follows:

Cross-examination by Mr. SCHWARTZ:

X Q. You know of course now that the upper of Collective Exhibit 4, the imported shoe, is made of what is known as Toyo cloth; is that correct?—A. That is right.

X Q. You know now of course what Toyo cloth, is composed, is that right?—A. Paper, I understand.

X Q. Paper. Does your company make any rubber-soled oxfords with paper uppers?—A. No.

X Q. Do you know whether any other company makes them in the United States?—A. I do not know of any.

X Q. You do not know of any?—A. No.

X Q. And I assume any footwear made, you would know about it, because it is your business?—A. That is right.

Upon this record the trial judge held as a matter of law that in spite of the fact that section 336 of the Tariff Act of 1930, under the authority of which the Presidential proclamation herein was issued, provides for an investigation by the Tariff Commission of the "differences of the costs of production of any domestic article and any like or similar foreign article," nevertheless, in view of the fact that section 402 (g) of said act, defining the American selling price, contains

only the word "such" and not the word "similar," therefore, inasmuch as the imported shoes herein are not identical with the domestic shoes, the Presidential proclamation does not apply to the facts in the instant case. In support of this holding the trial judge cites the decision in *United States* v. *Irving Massin & Bros.*, 16 Ct. Cust. Appls. 19, T. D. 42714, in which the appellate court very properly held the word "such" to mean "identical."

However, we are of the opinion, as contended for by counsel for the Government in his brief filed herein, that the word "such" in section 402 (g) of the Tariff Act of 1930, which defines American selling price, refers only to the domestic article and not to the foreign competitive article.

We therefore hold as a matter of law that the imported shoes in the instant case do not have to be identical with the domestic shoes herein in order to bring them within the purview of the Presidential proclamation herein. However, we are satisfied that the imported shoes herein are not like or similar to the domestic shoes in evidence herein.

In our opinion the word "similar" in the tariff sense means something more than similar in appearance only, which is all that the evidence herein discloses. To be similar within the meaning of section 336 of the Tariff Act of 1930 and the Presidential proclamation promulgated thereunder, requires that the imported and domestic shoes must be made of approximately the same materials and adapted to the same uses. In the case of *United States* v. *Irving Massin & Bros.*, 16 Ct. Cust. Appls. 19, T. D. 42714, cited by the learned trial judge, the appellate court said:

In view of the common meaning of the word "similar" and of the authorities cited, we are of opinion, and so hold, that if goods are made of approximately the same materials, are commercially interchangeable, are adapted to substantially the same uses, and are so used, ordinarily, they are similar, within the meaning of section 402 (b). * * *

The above interpretation of the word "similar" has been repeatedly followed by the United States Court of Customs and Patent Appeals. *Charles Hardy, Inc.* v. *United States*, 21 C. C. P. A. (Customs) 173, T. D. 46509; *United States* v. *Thomas & Co.*, 21 C. C. P. A. (Customs) 254, T. D. 46788; *United States* v. *R. W. Cramer & Co.*, 21 C. C. P. A. (Customs) 379, T. D. 46911; *United States* v. *Freitag & Sons, Inc.*, 21 C. C. P. A. (Customs) 500, T. D. 46961; *United States* v. *American Bluefriesveem, Inc.*, 22 C. C. P. A. (Customs) 67, T. D. 47063; *United States* v. *Briones & Co., Inc.*, 22 C. C. P. A. (Customs) 245, T. D. 47158.

It is to be observed, however, that all of the cited cases involved interpretation of the words "such or similar" in section 402 of the Tariff Act of 1930.

In the recent case of *Japan Import Co.* v. *United States*, Reap. Dec. 3825, 69 Treas. Dec. 1444 (affirmed in *Japan Import Co.* v. *United States*, 24 C. C. P. A. 167, T. D. 48642) which involved the question of the dutiable value of certain rubber-soled canvas shoes from Japan, Evans, Judge, in his exhaustive and well-considered opinion called attention to the fact that in section 336 of said act (under the authority of which the Presidential proclamation therein and herein was promulgated), the Congress used the words "like or similar" instead of "such or similar." He also pointed out that subsection (e) (2) (C) of said section 336 provides that in arriving at the cost of the foreign article the United States Tariff Commission must take into consideration relevant factors which may constitute an advantage or a disadvantage in *competition* between the foreign and the domestic articles. In that case, however, the learned judge found that the imported shoe and the domestic shoe (which latter formed the basis of the appraisement) were made of substantially the same material, made by the same process, and were used for the same purpose. Therefore, he held the imported shoe to be like or similar to the domestic shoe made in the United States at the time of exportation.

It is evident from a study of the authorities that the factors to be considered in determining the question of whether an imported article is like or similar to a domestic article which may be taken as the basis of appraisement under said section 336 are (1) similarity of material; (2) commercial interchangeability; (3) adaptability to the same use; and (4) competitive character.

In our opinion the shoes at bar do not meet any of these requirements. (1) By no stretch of the imagination can paper be said to be the same material as canvas. As well say that a glass artificial diamond composed of silica is made of the same material as a genuine diamond composed of carbon. (2) The fact that the imported merchandise herein sold at a much lower price than the domestic article demonstrates that the two are not commercially interchangeable. (3) While they may have been intended to be used for the same purpose, the uncontradicted evidence discloses that the imported shoes were immediately returned by the American customers for the reason that the paper uppers, when wet, became separated from the sole, thereby destroying the integrity of the shoe, and of course demonstrating that it was not capable of the same use as the domestic shoe. In a word, one ceased to be a shoe while the other retained its character as such. (4) While the imported shoes were undoubtedly intended to compete with the domestic shoe, nevertheless at the first test it was demonstrated that they were not in fact competitive for the reasons stated in the above number "(3)."

Upon the entire record therefore we find as a matter of fact and conclude as a matter of law that the imported shoes constituting the

imported merchandise herein are not like or similar to the domestic shoes upon which the appraiser based his appraisements herein. Accordingly, under the agreed stipulation of counsel for the respective parties, the dutiable value of the imported shoes is the export and entered value thereof as found by the trial judge, whose judgment is hereby affirmed.

Judgment will be rendered accordingly.