MUTUAL SUPPLY CO. *v.* UNITED STATES

**No. 5062.**—Invoice dated Osaka, Japan, June 12, 1938.
Certified June 14, 1938.
Entered at San Francisco, Oakland, Calif., July 14, 1938.
Entry No. 368.

(Decided December 6, 1940)

*Lawrence & Tuttle* (*George R. Tuttle* and *Frank L. Lawrence* of counsel) for the plaintiff.

*Charles D. Lawrence,* Acting Assistant Attorney General (*Richard H. Welsh* and *Richard F. Weeks,* special attorneys), for the defendant.

CLINE, Judge: This is an appeal for a reappraisement of rubber-soled shoes having cotton uppers, imported from Japan in June 1938. The merchandise is invoiced at 117.60 yen per 10 dozen pairs, packing included. It was entered under duress to meet advances made by the appraiser in other cases at $1.20 per pair for sizes 4, 4½, and 5 and $1.296 per pair for sizes 6 and 7. The appraiser returned the merchandise at the entered value which was considered as the American selling price of a like or similar shoe manufactured in the United States. The appraisement was made under the authority of a proclamation of the President of the United States published in T. D. 46158 in accordance with the provisions of section 336 of the Tariff Act of 1930.

Samples of the domestic shoe upon the basis of which the appraisement was made on the American selling price thereof were introduced in evidence and marked "Collective Exhibit 1" and a sample of the same shoe split lengthwise through the middle was admitted in evidence and marked "Illustrative Exhibit 4".

Samples of the imported shoe were introduced in evidence and marked "Collective Exhibit 2" and one of the same shoes split lengthwise through the middle was marked "Illustrative Exhibit 3". Another sample of the same shoe imported by another importer was introduced in evidence and marked "Exhibit 5."

Counsel for the plaintiff contends that the merchandise should be appraised on the basis of export value under section 402 (d) of the Tariff Act of 1930 rather than at the American selling price of a domestic shoe, and, for the purposes of this case, counsel for the respective parties stipulated in open court that the export value of the imported shoe is the invoice value, packing included, and that no higher foreign value existed at the time of exportation and that, if it be held that the merchandise should be appraised at the American selling price of a domestic shoe, the appraised values represent that American selling price value.

· In plaintiff's brief, two issues are presented for the court's consideration, namely:

1. That the President's proclamation, T. D. 46158, cannot exceed in scope the investigation made by the Tariff Commission and that the involved shoes were not involved in that investigation.

2. That these shoes are not "like or similar" to the domestic shoe on the basis of whose selling price they were appraised.

As these points are not alternative or mutually exclusive, but cumulative, plaintiff's contention that the appraisement was illegal may be sustained on either or both of the grounds stated.

For the purposes of the case a copy of report No. 63 of the United States Tariff Commission was offered in evidence. An objection to the receipt of this report by counsel for the defendant was taken under advisement and the report was marked "Exhibit 8 for identification." In view of plaintiff's first contention above quoted, the report becomes material and it will be received in evidence and marked "Exhibit 8," with exception granted defendant.

It appears from this exhibit that the United States Tariff Commission investigated the values, both foreign and domestic, of the following kinds of rubber-soled footwear having fabric uppers: Oxfords and sandals, the chief competing country in which was Japan, and lace-to-toe shoes, the chief competing country in which was Czechoslovakia. It also appears that the oxfords and lace-to-toe shoes were tennis shoes. The Tariff Commission investigated also the value of rubber footwear such as men's rubbers, women's gaiters, and boots not involved in this case.

Under the heading "FINDINGS OF THE COMMISSION" the shoes having fabric uppers which the commission investigated are described as follows:

6. The bulk of the domestic production and of the imports of rubber-soled footwear consists of (a) low shoes chiefly used for tennis and other sports and designated as oxfords; (b) higher shoes designated as lace-to-toe shoes; and (c) sandals, chiefly for women and misses. There are different grades and styles within each of these three classes. The commission selected for use as the basis of cost comparison representative grades and styles of each class produced in the United States and grades and styles of the product imported from the principal competing countries which were like or similar, respectively, to the domestic. The commission finds that the cost differences on these grades and styles are representative of the cost differences on all rubber-soled footwear made in the United States and in the principal competing countries.

The plaintiff contends that since the shoes herein involved are not oxfords, sandals, or lace-to-toe shoes but are high shoes used for farm work, they are not involved in the President's proclamation because the values of such shoes were not investigated by the Tariff Commission and that, insofar as the proclamation covers shoes other than oxfords, sandals, and lace-to-toe shoes, the same is invalid.

In support of his contention that this court has the authority to review or construe the President's proclamation and that such proclamation should be considered by the court as limited to the kind of shoes covered by the investigation, the plaintiff cites *Akawo & Co. et al.* v. *United States*, 23 C. C. P. A. 75, T. D. 47737; *Feltex Corp.* v. *Dutchess Hat Works*, 21 C. C. P. A. 463, T. D. 46957; and *Carl Zeiss, Inc.* v. *United States*, 23 C. C. P. A. 7, T. D. 47654. In the latter case the court said:

> The President, although not required by the provisions of section 336, *supra*, to accept the results or findings reported by the Tariff Commission, is required to limit his consideration of the case to the evidence presented to that body, and to approve the rates of duty and changes in basis of value specified by it, "if in his judgment such rates [and changes in basis of value] are shown by the investigation to be necessary to equalize such differences in costs of production."

In the case of *George S. Bush & Co., Inc.* v. *United States*, 27 C. C. P. A. 64, C. A. D. 64, the court reviewed a report of the Tariff Commission upon the basis of which the President made a proclamation authorizing the assessment of duty on canned clams from Japan at the American selling price of the competing domestic article and held that the proclamation was invalid because the Tariff Commission adopted a wrong principle in determining the value of the imported product for the period adopted for comparison of the value of the imported product with the value of the domestic product. That decision was reversed by the United States Supreme Court, however, when the case was brought before it by writ of certiorari. *United States* v. *George S. Bush & Co., Inc.*, 310 U. S. 371, T. D. 50159. The court said at page 379:

> * * * The President's method of solving the problem was open to scrutiny neither by the Court of Customs and Patent Appeals nor by us. Whatever may be the scope of appellate jurisdiction conferred by section 501 of the Tariff Act of 1930, it certainly does not permit judicial examination of the judgment of the President that the rates of duty recommended by the Commission are necessary to equalize the differences in the domestic and foreign costs of production.

It is settled, therefore, by the highest tribunal that the court has no authority to review the proclamation of the President made under the authority of section 336 of the Tariff Act of 1930 or the report of the Tariff Commission filed in connection therewith and I hold that there is no merit in the plaintiff's contention that the court has authority to hold that the President's proclamation published in T. D. 46158 is not applicable to the merchandise herein involved because the Tariff Commission did not consider such footwear.

The directions in the President's proclamation regarding the method to be adopted in imposing a tax on shoes having rubber soles and fabric tops are as follows:

> Now, therefore, I, Herbert Hoover, President of the United States of America, do hereby approve said report and proclaim that the rate of duty shown by said

investigation to be necessary to equalize such differences, within the limit provided in said section 336, on boots, shoes, or other footwear (including athletic or sporting boots and shoes), the uppers of which are composed wholly or in chief value of wool, cotton, ramie, animal hair, fiber, rayon or other synthetic textile, silk, or substitutes for any of the foregoing, with soles composed wholly or in chief value of india rubber or substitutes for rubber, is 35 per centum ad valorem based upon the American selling price as defined in section 402 (g) of said act of boots, shoes, or other footwear (including athletic or sporting boots and shoes), the uppers of which are composed wholly or in chief value of wool, cotton, ramie, animal hair, fiber, rayon or other synthetic textile, silk, or substitutes for any of the foregoing, with soles composed wholly or in chief value of india rubber or substitutes for rubber, manufactured or produced in the United States; * * *

The tariff provision under the authority of which the President made the proclamation published in T. D. 46158 reads, insofar as pertinent, as follows:

SEC. 336. EQUALIZATION OF COSTS OF PRODUCTION.

(a) CHANGE OF CLASSIFICATION OR DUTIES.—In order to put into force and effect the policy of Congress by this Act intended, the commission (1) upon request of the President, or (2) upon resolution of either or both Houses of Congress, or (3) upon its own motion, or (4) when in the judgment of the commission there is good and sufficient reason therefor, upon application of any interested party, shall investigate the differences in the costs of production of any domestic article and of any like or similar foreign article. * * *

(b) CHANGE TO AMERICAN SELLING PRICE.—If the commission finds upon any such investigation that such differences can not be equalized by proceeding as hereinbefore provided, it shall so state in its report to the President and shall specify therein such ad valorem rates of duty based upon the American selling price (as defined in section 402 (g)) of the domestic article, as it finds shown by the investigation to be necessary to equalize such differences. In no case shall the total decrease of such rates of duty exceed 50 per centum of the rates expressly fixed by statute, and no such rate shall be increased.

An examination of these provisions indicates that it is the duty of the court to appraise the imported shoes in this case at the American selling price of "like or similar" domestic manufactured shoes, provided the record contains sufficient testimony to show that there is a domestic manufactured shoe "like or similar" to the imported shoe. If there is no "like or similar" domestic shoe, it would be impossible to appraise the merchandise in accordance with the provisions of section 336 because it would be impossible to find the value of a "like or similar" domestic shoe when none existed. The appraiser's return has the presumption of correctness, however, and, if the plaintiff failed to introduce evidence showing that the domestic shoe which the appraiser selected as the basis for appraisement was not "like or similar" to the imported shoe, the value found by the appraiser must stand.

This court has held in numerous decisions that, when the record showed that the domestic shoes upon which the appraiser based his return were not "like or similar" to the imported shoes, the imported

shoes should be appraised upon the basis declared in section 402 of the Tariff Act of 1930, when all the elements necessary for appraisement under that section were proved. *Japan Import Co.* v. *United States*, 1 Cust. Ct. 607, Reap. Dec. 4389, affirmed in 2 Cust. Ct. 926, Reap. Dec. 4568; *Mitsubishi Shoji Kaisha, Ltd.*, v. *United States*, 1 Cust. Ct. 728, Reap. Dec. 4444, affirmed on the question of comparability of the shoes in 2 Cust. Ct. 935, Reap. Dec. 4570; *K. Samura Shoten, Ltd.*, v. *United States*, 1 Cust. Ct. 713, Reap. Dec. 4437; *Pacific Trading Co.* v. *United States*, 3 Cust. Ct. 580, Reap. Dec. 4649; *Bata Shoe Co.* v. *United States*, 73 Treas. Dec. 1600, Reap. Dec. 4330; *New York Merchandise Co., Inc.* v. *United States*, 73 Treas. Dec. 1480, Reap. Dec. 4279.

The expression "like or similar foreign articles" in section 336 was considered in the case of *Japan Import Co.* v. *United States*, 24 C. C. P. A. 167, 175, T. D. 48642. The court said:

Under the proclamation of the President and said section 336 (a) and (b), the appraisement of the imported goods was to be made at the American selling price of the domestic article like or similar to imported foreign articles, as defined by said section 402 (g). Were the imported goods like or similar to the goods used by the appraiser in ascertaining value? The word "like" has been defined by us in *American Foundation (Inc)* v. *United States*, 19 C. C. P. A. (Customs) 36, T. D. 44872, by the adoption of the definition of the word, as taken from Webster's New International Dictionary, 1925, as follows:

"Having the same, or nearly the same, appearance, qualities, or characteristics; similar."

\*         \*         \*         \*         \*         \*         \*

The word "similar" has had frequent attention on the part of this court. We first gave it extended attention in *United States* v. *Irving Massin & Bros.*, 16 Ct. Cust. Appls. 19, T. D. 42714. The words involved in the statute there in issue were "such" or "similar". We reiterated our former conclusion that the word "such" meant "identical", and as to the word "similar", referred to the definition given in Webster's New International Dictionary (1925), as follows:

"*Similar*. a. 1. Nearly corresponding; resembling in many respects; somewhat like; bearing a general likeness."

Further in the opinion, in elaborating on the meaning to be attached to the word "similar", we said:

"In view of the common meaning of the word 'similar' and of the authorities cited, we are of opinion, and so hold, that if goods are made of approximately the same materials, are commercially interchangeable, are adapted to substantially the same uses, and are so used, ordinarily, they are similar, within the meaning of section 402 (b)."

The latest decision of the appellate court which construed the word "similar" in section 402 held that "standard" Roquefort cheese was not similar to "portion" Roquefort cheese although the only difference in the two commodities appeared to be caused by a different method of curing. *United States* v. *Kraft Phenix Cheese Corp.*, 26 C. C. P. A. 224, C. A. D. 21.

The plaintiff in this case introduced the testimony of five witnesses who were merchants, dealers, or salesmen handling shoes like exhibit 2, namely Susumu Togasaki, Hisao Inouye, M. Tambara, Kazuaki Kuwada, and Y. Fukutome. They testified that shoes like exhibit 2 have generally been used by farmers (Japanese or Filipinos) in California who work in fields where asparagus or strawberries are grown; that they had never seen shoes like exhibit 1 used by those farmers; that the wearers of exhibit 2 stoop down and bend the feet and that exhibit 2 is more flexible than exhibit 1 and better adapted for such work; that shoes like exhibit 2 were sold to Japanese stores, dry goods stores, and grocery stores in the rural districts and they had not seen shoes like exhibit 1 for sale in the same stores.

The plaintiff called also Mr. George F. Wilson, who is a shoe buyer for "The Emporium," a department store in San Francisco. He testified that for the past 4 years he had purchased canvas rubber-soled shoes in the United States and that he supervised the activities of salesmen and salesgirls; that he was familiar with exhibit 1 but not with exhibit 2; that the two exhibits would not be commercially interchangeable.

The plaintiff called also Mr. Thomas E. Hearty, a former examiner at the port of San Francisco having supervision over the oriental division, with 25 years of experience. He testified to a minute examination and comparison of illustrative exhibits 3 and 4, which are the domestic shoe and the imported shoe split lengthwise through the middle; that he found the sole of the Japanese shoe to be made of rubber which was soft and light and fastened with poor rubber cement which was loose in some places, the cemented parts being easily detachable; that the foxing, which is the rubber edge of the sole extending up the side of the shoe, was loose and not attached in a thoroughly workmanlike manner; that the foxing is attached with adhesive and also reinforced by stitching; that the domestic shoe has foxing which is heavy and does not have any stitching; that the edges are more finished than on the Japanese shoe; that the rubber has more resiliency than that in the Japanese shoe; that just above the heel on the American shoe is a rubber guard which is lacking on the Japanese shoe; that the sole of the domestic shoe has five thicknesses or layers of rubber while the Japanese shoe has only four, which includes the inner sole; that the American shoe has a shank which is reinforced by a metal strip introduced in front of the heel while the Japanese shoe contains no metal; that the quality of the material in the American shoe is superior to that in the Japanese shoe; that the inner sole in the domestic shoe is made of reinforced cushioned rubber whereas the Japanese shoe contains a piece of cotton fabric; that the counters in the American shoe are better reinforced and hold up better than the counters in the

Japanese shoe due to better workmanship and thicker material; that the uppers in the Japanese shoe, both inner and outer, are made from lighter material than those in the American shoe which is shown by a thread count he made of the cloth in the uppers of both shoes; that the upper in the American shoe is porous whereas the upper in the Japanese shoe is not; that the tongue in the American shoe is double thickness while the tongue in the Japanese shoe is of single thickness. On cross-examination the witness testified that both the American shoe and the Japanese shoe have canvas uppers, two pieces of cloth being cemented together; that both have bellows tongues; that both have rubber soles and heels; that both have rubber foxings and rubber caps; that the domestic shoe has six eyelets for the shoe laces while the Japanese shoe has three eyelets and three hooks; that both shoes have insoles; that he had seen the Japanese shoes worn by Japanese farmers in field work and the domestic shoes are advertised for use in garden work and they are called garden shoes.

The defendant introduced the testimony of Mr. Fred M. Bock, who is sales manager of footwear and clothing for the United States Rubber Co. He testified that both illustrative exhibits 3 and 4 are composed of rubber and have canvas uppers and bellows tongues; that the American shoe has an insole with smooth surface and non-absorbent qualities underneath which is a layer of sponge rubber, a compound of rubber and other materials, while the Japanese shoe has a canvas top on the insole with a layer of rubber compound underneath; that 11 years previously he had sold shoes of the type of exhibit 1, the domestic shoe, to people working in the fields, to carpenters, and to hunters; that he had seen people in the fields and on the streets wearing shoes like exhibit 2, the Japanese shoe; that he had seen Japanese, Chinese, and Americans wearing them; that there are certain people to whom both types of shoes, exhibits 1 and 2, appeal. On cross-examination he testified that in his opinion every shoe made by his company is superior to those of his competitors; that the shoes he handles have porous or breather tops which is an advantage; that the retail merchants told him that his shoes were used by field workers, carpenters, and hunters.

The next witness called by the defendant was Mr. Alexander W. McKee, who for 14 years had been employed by the Hood Rubber Co., the manufacturers of exhibit 1. He testified that he has seen shoes like exhibit 5 for a long period of time in the shoe stores in the rural districts; that both exhibits 3 and 4 have canvas uppers and rubber soles and heels but the insoles are different; that in his opinion both types of shoes will appeal to the same type of customer. On cross-examination he testified that he had not made a practice of calling on the rural trade since 1931; that he had not seen persons

wearing shoes like exhibit 2, the imported shoe; that he came in contact with shoes like exhibit 2 in connection with the shrinkage of his sales of shoes like exhibit 1 in 1932; that he has meetings with his salesmen in which he gets the reactions of the trade and he forms his opinion largely from these meetings.

The defendant cites *Japan Import Co.* v. *United States*, 24 C. C. P. A. 167, T. D. 48642, wherein the appellate court affirmed the judgment of the trial court in holding that the imported shoes under consideration in that case were similar to certain domestic shoes and should be appraised at the American selling price of the domestic shoes. The evidence did not disclose that there was much difference between the imported shoes and the domestic shoes as shown by the testimony of the examiner quoted in the decision of the United States Customs Court (69 Treas. Dec. 1444, Reap. Dec. 3825) from which appeal was taken to the Court of Customs and Patent Appeals. The appellate division stated that the testimony showed that the imported and the domestic shoes "have the same characteristics, are made of substantially the same material, by the same process, and used for the same purpose and are commercially interchangeable, have the same commercial value; that one can be sold as readily as the other and that they are sold in competition and within the same price range and selling value."

I find that the likeness or similarity in the competing shoes which existed in the case cited by the defendant is not established in the case herein involved. The shoes represented by exhibits 1 and 2 are not commercially interchangeable and there is a great disparity in value. The domestic shoes are not sold in the same stores which handle the Japanese shoes and the two shoes are not used by the same people, the imported shoes having a flexible sole adaptable for use by farmers who are required to work in a stooping position while the domestic shoes have a strip of metal in the soles which makes them more rigid and less flexible. Furthermore, the Japanese shoes are made of inferior materials and indicate a lower quality of workmanship. Also there is a marked difference in the uppers, insoles, and tongues. In my opinion the domestic shoes represented by exhibit 1 and the Japanese shoes represented by exhibit 2 are not like or similar.

I hold that the imported shoes should be appraised on the basis of export value under section 402 (d) of the Tariff Act of 1930, the foreign value being no higher, and that such export value, as shown by the stipulation entered into between the parties, is the unit invoice value, packing included. Judgment will be entered accordingly.