(C. D. 1884)

W. J. Byrnes & Co. of N. Y., Inc.
The Museum of Modern Art $\Big\}$ v. United States

United States Customs Court, First Division

(Decided June 4, 1957)

*Barnes, Richardson & Colburn* (*Edward N. Glad* of counsel) for the plaintiffs.
*George Cochran Doub*, Assistant Attorney General (*Joseph E. Weil*, trial attorney), for the defendant.

Before OLIVER, MOLLISON, and WILSON, Judges

WILSON, Judge: The importation under consideration is invoiced as "Paper Slippers" and was classified by the collector under paragraph 1530 (e) of the Tariff Act of 1930 as "Boots, shoes, or other footwear * * * the uppers of which are composed wholly or in chief value of wool, cotton, ramie, animal hair, fiber, rayon or other synthetic textile, silk, or substitutes for any of the foregoing, whether or not the soles are composed of leather, wood, or other materials," and was assessed at the rate of 35 per centum ad valorem. The plaintiffs contend that the merchandise is properly classifiable under paragraph 1413 of the Tariff Act of 1930, as modified by the Annecy Protocol of Terms of Accession to the General Agreement on Tariffs and Trade, T. D. 52373, supplemented by Presidential proclamation, T. D. 52462, as "Manufactures of paper, or of which paper is the component material of chief value, not specially provided for, * * *" at 17½ per centum ad valorem.

The facts in this case are not in dispute. The merchandise consists of paper coverings for human feet represented by plaintiffs' exhibit 1. It was stipulated between the parties that "Exhibit #1 consists of paper uppers and paper soles held together by a natural adhesive, starch type" (R. 22–23), and a chemical analysis of the material of which exhibit 1 is composed, by a Government chemist by order of the court, shows that the merchandise consists of—

* * * double-ply soles (98%) with crossed straps (2%).

The sole plies are laminated by means of a natural adhesive (starch type). Each ply is 0.067 in. thick and composed of approximately 70% bleached chemical wood pulp and 30% unbleached chemical wood pulp.

The straps are paper of 0.006 in. thickness composed of approximately 20% chemical wood pulp and 80% vegetable fibers (hemp type).

It is conceded that the merchandise was imported for a special purpose by one of the plaintiffs, The Museum of Modern Art, a public educational institution. According to the undisputed testimony of Charles T. Keppel, the only witness called in the case, it appears that said institution—

* * * as part of its exhibition program imported to this country * * * a Japanese house representing the best in architectural design in Japan. It actually is a house designed along the lines of the house of the Sixteenth Century, but it is still classical design in Japan.

As part of that and as an architectural feature of it, the floors were of very fine wood * * *. (R. 9.)

The witness then explained that the floors of the imported house were covered with mats about 4 inches thick "which the Japanese not only walk on but they sleep on." The witness further testified that The Museum of Modern Art anticipated a large number of people would visit this imported house, and that, in order to recreate a Japanese atmosphere and to keep the visitors' shoes from cutting up the mats, the exhibitor requested that all visitors remove their shoes and put on a pair of the imported paper slippers. The paper slippers were the cheapest the exhibitor could buy, and their use held to a minimum the wear on, and damage to, the mats and the floors. After being worn but once, the slippers were discarded, unless taken by the wearers as souvenirs.

Our first inquiry is whether the paper foot coverings, heretofore described, consisted of "footwear * * * the uppers of which are composed wholly or in chief value of wool, cotton, ramie, animal hair, fiber, rayon or other synthetic textile, silk, or substitutes for any of the foregoing, * * *." According to common understanding, the term "footwear" would seem to include only such apparel or covering for the feet as is designed to protect the foot and to be worn for an indefinite period of time. The samples in evidence obviously are not shoes or boots, and, if classifiable under paragraph 1530 (e) of the Tariff Act of 1930, as contended by the defendant, must properly come under the provisions for "other footwear." However, looking at the entire paragraph, the only reasonable construction appears to be that Congress intended to bring under that paragraph only such items as are generally understood to constitute footwear, that is, as hereinbefore mentioned, articles designed to protect the feet and to be worn over an indefinite period of time. Should the merchandise in question, however, be held to fall within the definition of footwear, for tariff purposes, under the provisions of paragraph 1530 (e), we are convinced that the uppers of the paper slippers in question are not substitutes for wool, cotton, ramie, animal hair, fiber, rayon or other synthetic textile, or silk. *Tai Lung Co.* v. *United States*, 18 C. C. P. A. (Customs) 35, T. D. 44004, and *Dorward & Sons Co. Pacific Vegetable Oil Corp.* v. *United States*, 40 C. C. P. A. (Customs) 159, C. A. D. 512.

In our opinion, the plaintiffs have overcome the presumption of correctness of the collector's classification. That leaves for determination the question of whether the merchandise is properly classifiable under paragraph 1413 of the Tariff Act of 1930, as modified, as "Manufactures of paper, or of which paper is the component material of chief value, not specially provided for, * * *" at 17½ per centum ad valorem. In its brief, the Government contends that, since the chemist's analysis of plaintiffs' exhibit 1 shows that the laminated soles are held together by a natural adhesive (starch type), the record

is not clear as to whether the merchandise is in chief value of paper or starch. We think this contention is without merit. A visual examination of plaintiffs' exhibit 1 shows the paper slippers to be composed of paper. The natural adhesive referred to is for the incidental purpose of holding together the two parts of the laminated paper sole. In the case of *Hague & Co. (Inc.)* v. *United States*, 7 Ct. Cust. Appls. 75, T. D. 36391, the merchandise in question consisted of metal safety pins and hairpins, lacquer coated. The importation was classified under paragraph 158 of the Tariff Act of 1913, providing for "Pins with solid heads, without ornamentation, including hair, safety, hat, bonnet, and shawl pins; * * * composed wholly of * * * iron * * *." The importer contended that the lacquer coating on the pins removed them from the provision of paragraph 158, *supra*. The appellate court quoted with approval the following paragraph from the decision of the Board of General Appraisers:

> We cannot believe that the legislators ever entertained any such idea in enacting into law the provisions of said paragraph 158. It is a matter of common knowledge, of which the Board is certainly entitled to take judicial notice, that practically all of the common and ordinary hair, hat, bonnet, and shawl pins, which are employed for everyday use, are invariably coated or painted with some substance intended to act as a preservative against atmospheric conditions. That Congress was also fully cognizant of this self-evident fact is known by the very language of paragraph 158, since it specifically excepts from the operation thereof any of the pins enumerated therein which are plated with gold or silver. An uncoated or unplated hairpin is such a rare item of merchandise that it is hardly conceivable that Congress would have deemed it necessary to enact a special provision of law to cover it.

The appellate court, in the *Hague* case, *supra*, referred to the case of *Samuel Schiff & Co.* v. *United States*, 140 Fed. 63, which was affirmed in *United States* v. *Samuel Schiff & Co.*, 145 Fed. 1023. In the *Schiff* case, *supra*, the merchandise consisted of braids of straw, the end of which were temporarily tied with cotton threads to prevent raveling. In reversing the holding by the Board of General Appraisers, the circuit court, in the *Schiff* case, *supra* (140 Fed. 63), stated:

> The board seems to have reached its conclusion upon an erroneous view as to the effect of certain cotton threads, which, according to the testimony, are only used for temporarily tying the ends of the braids to prevent them from unraveling. It is thought that the merchandise should have been assessed as braids or plaits composed wholly of straw, etc., and suitable for making or ornamenting hats, rather than as hats partly manufactured.

On the record here presented, we hold that the merchandise before us is properly classifiable as manufactures of paper, or of which paper is the component material of chief value, not specially provided for, as contended, and that it should be assessed, as such, at 17½ per centum ad valorem under paragraph 1413 of the Tariff Act of 1930,

as modified by the Annecy Protocol of Terms of Accession to the General Agreement on Tariffs and Trade, T. D. 52373, supplemented by Presidential proclamation, T. D. 52462.

The protest is, therefore, sustained and judgment will be entered accordingly.