(C.D. 2527)

CORNET STORES *v.* UNITED STATES

United States Customs Court, First Division

(Decided April 12, 1965)

*Lawrence & Tuttle* and *Glad & Tuttle* (*Edward N. Glad* of counsel) for the plaintiff.

*John W. Douglas,* Assistant Attorney General (*Richard J. Kaplan,* trial attorney), for the defendant.

Before WILSON and NICHOLS, Judges; OLIVER, C.J., not participating

NICHOLS, Judge: The merchandise involved in these cases, consolidated at the trial, described on the invoices as toyo cloth sneakers, consists of rubber-soled footwear with toyo cloth uppers. It was imported from Japan and entered at the port of Los Angeles, during 1960. Counsel stipulated at the trial that the articles were in chief value of rubber, and the material of the uppers was referred to both as toyo cloth and as toyo paper. The shoes were classified as footwear, the uppers of which are composed wholly or in chief value of a substitute for cotton, with soles wholly or in chief value of rubber, and were assessed with duty at 20 per centum ad valorem (not at American selling price) under paragraph 1530(e) of the Tariff Act

of 1930, as modified. It is claimed that the toyo cloth uppers cannot be considered a substitute for cotton uppers and that the shoes are properly dutiable as manufactures in chief value of rubber at 12½ per centum ad valorem under paragraph 1537 (b), as modified.

The pertinent provisions of the tariff act, as modified by the Protocol of Terms of Accession by Japan to the General Agreement on Tariffs and Trade, T.D. 53865, supplemented by T.D. 53877, are as follows:

| Tariff Act of 1930 paragraph | Description of Products | Rate of Duty |
|---|---|---|
| 1530(e) | Boots, shoes, or other footwear (including athletic or sporting boots and shoes), the uppers of which are composed wholly or in chief value of * * * cotton, * * * or substitutes for any of the foregoing:<br>    With soles wholly or in chief value of india rubber of substitutes for rubber. | 20% ad val. |
| * | *   *   *   *   * | * |
| 1537(b) | Manufactures of india rubber or gutta percha, or of which these substances or either of them is the component material of chief value, not specially provided for (except * * *): | |
| * | *   *   *   *   *<br>    Other_____ | *<br>12½% ad val. |

At the trial, plaintiff's witness, John E. Empey, produced a pair of sneakers having toyo cloth uppers which were received in evidence as plaintiff's collective exhibit 1, as representative of the material of which the uppers are made. The upper consists of an outer woven material and a lining and is lighter in weight and softer than the usual canvas upper of sneakers. A visual examination does not disclose of what the outer material or the lining are composed. Apparently, the shoes have been wet, as the red dye has bled into the lining and the white trim. At the toe of one shoe, the rubber portion has separated from the upper. Although the parties have referred to the upper as composed of toyo cloth or toyo paper, it is not clear whether both the outer portion and the lining are of that material. Attached to entry No. 15348 is a breakdown indicating that the shoes were composed of toyo cloth (paper), fabric (back cloth, cotton thread, cotton tape, reinforcing cloth, inner sole cloth), and rubber. The value given for the toyo cloth is greater than that given for the fabric, but less than the rubber, as stipulated.

Mr. Empey testified that he has been a buyer for Cornet Stores, the plaintiff herein, for 10 years, and has been with the firm for 25 years, and has been familiar with merchandise like plaintiff's exhibit 1, for 2 or 3 years. He has handled rubber-soled shoes with cotton uppers,

rayon uppers, and toyo cloth or paper uppers. He did not know whether the imported merchandise could be used in the same manner as rubber-soled shoes with cotton uppers. However, he said that the latter could withstand moisture and that he had seen them being washed in a washing machine, but he did not think the imported shoes could withstand moisture, because the upper was made of paper and if paper gets wet, it deteriorates. He thought that exhibit 1 had been wet, but he did not know what had been done to it since importation. His firm sells shoes with cotton uppers of varying qualities, but he had never seen the poorer quality being washed. His firm sold shoes to the public in retail stores, but he was not directly involved in selling and did not know how the different shoes were sold.

At the conclusion of the trial, it was stipulated that the basis of classification of the merchandise was that it was considered to be rubber-soled footwear which had uppers composed of a substitute for cotton, and that all rubber-soled footwear with toyo paper uppers imported through the port of Los Angeles are of the same generic type as exhibit 1.

The issue before the court is whether or not the toyo cloth uppers of the imported shoes constitute uppers made of a substitute for cotton. It has been held that the phrase "substitutes for any of the foregoing" does not mean that any material is a substitute if uppers are made of it but is limited to materials which could be substituted for the material named. *Tai Lung Co.* v. *United States*, 18 CCPA 35, T.D. 44004. In that case, it was held that straw was a substitute for fiber or ramie (which were enumerated in paragraph 1405 of the Tariff Act of 1922, the predecessor to paragraph 1530(e), *supra*), because the characteristics and uses of vegetable fibers were quite similar to those of straw. On the other hand, in *Torch Rubber Co., Inc., et al.* v. *United States*, 41 Cust. Ct. 161, C.D. 2035, shoes had uppers composed in chief value of a plastic, polyureathene foam, claimed to be a substitute for a synthetic textile. In the course of the opinion, the court stated (p. 165):

* * * Congress must have considered that there were three classes of materials which might be used in footwear uppers, i.e., (1) the materials enumerated, (2) substitutes therefor, and (3) other materials. Classes (1) and (3), although having the same use, just as the metal bushings and the jewels in the *Bulova* case did, nevertheless would have different names and different primary, basic, or essential characters. The materials covered by class (2), the substitutes for class (1), would have different names from those of class (1), but their primary, basic, or essential characters would be the same as those of class (1), although in some other respects they might be different.

To bring these concepts to the situation at bar, it seems clear that it is a *sine qua non* of a textile that it be a woven fabric or material or a material capable of weaving. That is its essential character, and it follows that a substitute for a synthetic textile would necessarily have to exhibit that character.

Since the uppers in that case did not have that essential character, it was held that they were not composed of a substitute for a synthetic textile.

In *Bulova Watch Co.* v. *United States*, 21 CCPA 156, T.D. 46494, referred to in the above case, the court held that certain metal bushings could not be held to be substitutes for jewels in watch movements, since jewels are selected because of their hardness and the smaller amount of friction encountered in their use, and that a device which did not possess those qualities could not be considered a substitute for a jewel, even though it might perform some of the functions of a jewel. This is a very carefully considered decision in which, in the absence of legislative history, the intent of Congress in enacting a duty on substitutes for watch jewels is ascertained in a satisfactory manner by an analysis of the entire statutory scheme respecting watches, and the changes effected in the 1930 act over prior legislation. The opinion shows that to treat the bushings as jewel substitutes would cause an arbitrary and whimsical increase in the duty on one kind of watch, all out of proportion to the increases on other kinds.

In *Dorward & Sons Co. et al.* v. *United States*, 40 CCPA 159, C.A.D. 512, it was held that blown rapeseed oil, used in lieu of rubber in the manufacture of caulking compound, was not a rubber substitute within the meaning of the Internal Revenue Code which excepted from tax "rapeseed oil imported to be used in the manufacture of rubber substitutes." The court points out with examples the difference in semantics between use of an article in "lieu" of another and use of it as a "substitute" for another, the former, of course, being the more inclusive term. (P. 163.)

The question here is whether the classification of the merchandise under paragraph 1530(e), *supra*, is in conformity with the law as it stood at the time of entry. This depends in turn upon whether toyo cloth in uppers is, in fact and law, a substitute for the cotton designated in that paragraph. In order to determine this, it is necessary to consider whether the two have "essential characteristics" in common, making a case of substitution and not mere use in lieu. Since the collector has classified the merchandise as rubber-soled footwear, with uppers composed of a substitute for cotton, it is presumed that he found that the material had the required characteristics. *E. I. du Pont de Nemours & Co.* v. *United States*, 27 CCPA 146, 149, C.A.D. 75. Plaintiff, therefore, has the burden of establishing that it did not. *United States* v. *Fred. Gretsch Mfg. Co., Inc.*, 28 CCPA 26, C.A.D. 120; *Dorward & Sons Co. et al.* v. *United States, supra;* *Wah Shang Company* v. *United States*, 44 CCPA 155, C.A.D. 654.

A visual examination of the exhibit discloses that the material has the essential characteristic that was missing in the *Torch Rubber Co.*, case, *supra*, namely, that it is woven.

There may, however, be other essential characteristics. Selection of an "essential characteristic" would be merely subjective if it did not reflect consideration of what the statute sought to accomplish in providing a tariff on a substitute. Here, as in *Bulova, supra*, guidance from legislative history is unavailable, but, unlike *Bulova*, we have here nothing like the elaborately graduated system of imposts on watches to fit our provision into. On the face of paragraph 1530(e), Congress simply did not want the tariff on sneakers to be avoided by any feasible use of unusual materials, in lieu of those common in the industry. If woven, if not readily distinguishable to the inexpert eye from a cotton upper, if apparently usable like a cotton upper, the toyo cloth upper is a substitute for a cotton upper with these several essential characteristics in common. Inspection of the samples affords evidence that the uppers meet this test. Any other holding would frustrate the manifest intent of Congress. This holding is not out of harmony with that in *Torch Rubber Co, supra*, where the upper was, as described in the opinion, as unlike a synthetic textile as it would be possible for a material to be. And *cf.* T.D. 55583(1). In respect of washability, there may be differences between a toyo cloth upper and a cotton upper, or there may not, but, in any event, nothing before us shows or suggests that washability is an "essential" characteristic. It seems reasonable to suppose that a cheaper article may be more willingly discarded when dirty; hence, washability, in a substitute, is possibly not essential but dispensable. There is nothing to show how often consumers undertake to wash sneakers of even the more expensive types. It may be that even these are simply allowed to fester as the olfactory evidences of use become more manifest.

Toyo cloth has been before the courts on other occasions, and its method of manufacture was described in *Edward M. Poons Co. of Kobe, Inc.* v. *United States*, 26 CCPA 310, 311, C.A.D. 33, as follows:

* * * Rolls or sheets of paper are cut into strips of narrow width, the width depending upon the fineness of the texture desired for the finished article. The strips are machine twisted and wound on a spool, after which they are dipped into a bath of cellulose material which adheres to the paper and is allowed to dry. The dipping and drying processes are repeated a sufficient number of times to form a coating, of a desired thickness, upon the paper. After drying, the twisted yarn-like threads or strings are put up in skeins 600 feet in length. The skeins of material are then, by a weaving process, formed into Toyo hats and Toyo cloth in the same manner that natural straw is used in making Panama hats.

In the absence of contrary evidence in the instant case, we notice this extract as a determination of the common meaning of toyo cloth.

It has been held that articles described as "Paper Slippers" were not classifiable under paragraph 1530(e), *supra*, but it is apparent that the items were not made of anything resembling toyo cloth. They were described by the court as consisting of paper uppers and paper soles held together by a natural adhesive, were used in a museum to cover

visitors' shoes, and were discarded after being worn once. *W. J. Byrnes & Co. of N.Y., Inc., et al.* v. *United States*, 38 Cust. Ct. 339, C.D. 1884. The court said (p. 341):

* * * Should the merchandise in question, however, be held to fall within the definition of footwear, for tariff purposes, under the provisions of paragraph 1530(e), we are convinced that the uppers of the paper slippers in question are not substitutes for wool, cotton, ramie, animal hair, fiber, rayon or other synthetic textile, or silk. * * *

Plaintiff relies on *United States* v. *Japan Import Co., Inc.*, 2 Cust. Ct. 926, Reap. Dec. 4568. While not binding, by virtue of *stare decisis*, as plaintiff claims, since it was a reappraisement proceeding under a different provision of law than that to be applied here, the case involves rubber-soled shoes with toyo cloth uppers, requires careful consideration, and has received it.

That case interprets the Presidential proclamation, T.D. 46158, which prescribes that the duty on certain rubber-soled footwear, including that with uppers composed of a substitute for cotton, shall be based on the American selling price of a competitive domestic article. The appraiser had found value on the basis of the price of certain domestic shoes. The court held that this was erroneous on the ground that the imported merchandise was not like or similar to the domestic shoes. The imported shoes had rubber soles and two-piece uppers, consisting of a veneer of paper and a lining of cotton, referred to as toyo paper cloth. The court pointed out that one of the witnesses testified—

* * * that in his opinion there were no similar domestic shoes; that the domestic shoe has a canvas upper which can be cleaned by washing and also a reinforcement at the toe, neither of which characteristics is present in the imported shoe; that any attempt to clean the upper of the imported shoe with water could result in tearing the latter away from the sole; that when he sold the imported shoes 90 per centum thereof were returned to him for the reason that the upper could not be washed or vulcanized as was possible with the canvas uppers of the domestic shoes; and that as a result of this experience he discontinued trying to sell the imported shoes. [Pp. 929–930.]

The court concluded (p. 933):

It is evident from a study of the authorities that the factors to be considered in determining the question of whether an imported article is like or similar to a domestic article which may be taken as the basis of appraisement under said section 336 are (1) similarity of material; (2) commercial interchangeability; (3) adaptability to the same use; and (4) competitive character.

In our opinion the shoes at bar do not meet any of these requirements. (1) By no stretch of the imagination can paper be said to be the same material as canvas. As well say that a glass artificial diamond composed of silica is made of the same material as a genuine diamond composed of carbon. (2) The fact that the imported merchandise herein sold at a much lower price than the domestic article demonstrates that the two are not commercially interchangeable. (3) While they may have been intended to be used for the same purpose, the uncontradicted evidence discloses that the imported shoes were immediately

returned by the American customers for the reason that the paper uppers, when wet, became separated from the sole, thereby destroying the integrity of the shoe, and of course demonstrating that it was not capable of the same use as the domestic shoe. In a word, one ceased to be a shoe while the other retained its character as such. (4) While the imported shoes were undoubtedly intended to compete with the domestic shoe, nevertheless at the first test it was demonstrated that they were not in fact competitive for the reasons stated in the above number "(3)."

That case would be more persuasive as authority if we could assume the merchandise considered was the same as here, but there is no evidence or stipulation that this is so. The court, in that case, as our quotations show, was much influenced by uncontroverted evidence that the shoes with toyo paper cloth uppers were unmerchantable, being 90 percent returned by buyers, because the uppers, when wet, separated from the soles. In the instant case, the upper of one sample is separated, but we are not told why. We would be rash to assume the shoes before us to be unmerchantable because of the faults of those imported 26 years earlier. We assume *arguendo*, without deciding, that, despite the differences in language to be construed, the *Japan Import* findings and decision would have pointed toward a holding that the *same* defective toyo cloth was not a "substitute." As matters are, plaintiff got everything out of *Japan Import* it was entitled to get, maybe more, if the appraiser followed it in not appraising on the basis of American selling price. It is well understood to be possible for a sneaker to be within the ambit of paragraph 1530(e) yet outside the Presidential proclamation, which prescribes American selling price valuation for some *but* not all articles classified under paragraph 1530(e). We find no authority or jurisprudence dealing with toyo cloth, therefore, which is inconsistent with the conclusion we reach.

The presumption of correctness of the collector's classification requires that it be upheld, and the protests overruled.